## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| UNITED STATES OF AMERICA, STATE OF NEW JERSEY, and STATE OF NEW YORK, | |
|---|---|
| | **Case No. _____** |
| **ex rel. [UNDER SEAL],** | **Hon. _____** |
| **Plaintiff/Relator,** | |
| | **QUI TAM COMPLAINT** |
| **vs.** | **FILED UNDER SEAL** |
| | **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **[UNDER SEAL]** | |
| | **JURY TRIAL DEMANDED** |
| **Defendant[s].** | |

Eric H. Jaso
FLEMING RUVOLDT PLLC
250 Moonachie Road
Suite 501
Moonachie, NJ 07074
Tel. (201) 518-7878
Fax (201) 518-7879
*Attorneys for Plaintiff/Relator*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NEW JERSEY, STATE OF NEW YORK, and STATE OF CONNECTICUT, *ex rel.* JOHN DOE, | Case No. _____ <br><br> Hon. _____ |
| Plaintiff/Relator, <br><br> vs. | **QUI TAM COMPLAINT** <br> **FILED UNDER SEAL** <br> **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| SHIEL HOLDINGS LLC d/b/a SHIEL MEDICAL LABORATORY, INC.; SPECTRA LABORATORIES, INC.; FRESENIUS MEDICAL CARE HOLDINGS, INC., d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA; FRESENIUS MEDICAL CARE NORTH AMERICA L.P.; and FRESENIUS MEDICAL CARE SE & Co. KGaA; Defendants. | **JURY TRIAL DEMANDED** |

Eric H. Jaso
FLEMING RUVOLDT PLLC
250 Moonachie Road
Suite 501
Moonachie, NJ 07074
Tel. (201) 518-7878
Fax (201) 518-7879
*Attorneys for Plaintiff/Relator*

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 *et seq.* and
## NEW JERSEY, NEW YORK and CONNECTICUT STATE COUNTERPARTS

On behalf of the United States of America, the State of New Jersey, and the State of New York, Plaintiff and Relator John Doe ("Relator"), by and through Relator's attorney, files this *qui tam* action against Defendants Shiel Holdings LLC, d/b/a Shiel Medical Laboratory, Inc. ("Shiel"), Spectra Laboratories, Inc. ("Spectra"), Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America ("Fresenius NA"), Fresenius Medical Care North America L.P. ("Fresenius LP") and Fresenius SE & Co., KGaA ("Fresenius Germany") (collectively "Defendants") and alleges as follows:

## I.   INTRODUCTION

### A.   Federal Law Claims

1.     Relator John Doe files this *qui tam* lawsuit on behalf of the United States, New Jersey, New York and Connecticut Governments, which have been respectively defrauded and suffered millions of taxpayer dollars in damages as the intended result of Defendants' submitting false and fraudulent claims for reimbursement to Medicare, Medicaid, and other government health-insurance programs, by creating, altering, or otherwise keeping false and fraudulent healthcare documentation (including having sales reps and other employees add "covered" diagnostic codes to billing records which were never chosen and/or approved by the ordering doctor), and by inducing and rewarding patient referrals by providing doctors free goods and services which constituted illegal kickbacks, all in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

2.     Pursuant to the FCA, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false or fraudulent claims that Defendants

1

submitted or caused to be submitted to Federally-funded health insurance programs for services rendered at Defendants' medical laboratories, including payments made by Medicaid and Medicare.

    **B.**    **State Law Claims**

    3.    This is also an action to recover double and treble damages and civil penalties on behalf of the States of New Jersey, New York and Connecticut arising from the conduct of Defendants who: (a) made, used or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the State; and/or (b) made, used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State, all in violation of the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 through 2A:32C-17, the New York False Claims Act, N.Y. State Fin. Law §§ 187-194, and the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 through 4-289. The false or fraudulent claims, statements and records at issue involve payments made by health insurance programs funded by the State government, including Medicaid.

**II.**    **SUMMARY OF ALLEGATIONS**

    4.    Relator John Doe, who was employed by Defendants for several years, brings this whistleblower action to expose the illegal billing and marketing schemes engaged in by the management of Defendant Shiel, a diagnostic medical laboratory business based in Rockleigh, New Jersey, which primarily serves the greater New York metropolitan area.

    5.    Medicare and Medicaid statutes and regulations require documentation of medical necessity for diagnostic medical tests, including requiring the ordering doctor to provide a diagnosis code indicating the patient's actual or suspected disease or condition. However, these government programs do not reimburse for all tests regardless of diagnosis code. Some tests are

2

considered "non-covered" for certain diagnosis codes, and any claim for reimbursement of such tests will be rejected.

6.   Generally in those circumstances, either the patient must pay the lab or the lab must "eat" the cost of the test.

7.   However, for at least the past six years and currently, Shiel management has willfully and intentionally disregarded these statutes and regulations, in order to maximize company revenues and personally profit.

8.   Rather than follow the compliant procedures outlined above, Shiel's billing department generates a "Missing Diagnosis Code" report (internally referred to as a "code sheet" or "code") when a claim for reimbursement is rejected.

9.   The sales representative ("sales rep") responsible for the account is given the code sheet and instructed to send the sheet back to the doctor's office and ask the doctor to pick a different, covered diagnostic code, and sign the sheet. (Sales reps either do this personally or send a service rep or other employee). The sheet is then to be transmitted or delivered back to Shiel's billing department, which will re-submit the claim for reimbursement.

10.   Even Shiel's supposedly "correct" procedure is problematic, however, because by Medicare regulations and best practices, as acknowledged in Shiel's own billing guidance for providers, the doctor is supposed to choose the diagnosis code that most accurately reflects the patient's actual condition, not any code that will get the claim paid.

11.   However, Shiel's fraudulent scheme goes much further. Because some providers' lab orders result in huge volumes of code sheets, the responsible sales reps and employees find it virtually impossible to get the doctors to review charts, choose new codes, and sign off on all of them (even assuming that an ethical doctor would agree to change the code at all). Nonetheless,

3

management puts tremendous pressure on sales reps and other employees to get the coding

sheets filled out with covered diagnosis codes and with documented doctor approval (or in the

Shiel vernacular, "get the codes done." This pressure includes verbal chastising and criticism as

well as threats of demotion, pay cuts or even termination.

12.     Shiel also provides incentive compensation for its sales reps, whereby sales reps

and certain employees tasked with servicing customer relationships get a percentage of collected

revenues from lab tests ordered by their customers. This provides a strong economic incentive

for the sales reps and other employees to "get the codes done" in any way possible, because re-

submitted reimbursement claims generate revenue for the company and thus money in their

pockets.

13.     With management knowledge and approval, many (indeed most) sales reps

commit outright fraud in order to "get the codes done." Among other things, they fill out the

code sheets themselves (usually without consulting the patient chart, which would be a HIPAA

violation in any event) and fake doctors' signatures or approvals, sometimes by taking sheets to

doctors' offices and getting staff to stamp the sheets and "borrowing" the office fax machine to

fax them back to Shiel's billing department, so it appears that the sheets were actually approved

by the doctor and transmitted by the doctors' office staff. Sales reps and employees often induce

or reward the staffs' compliance by providing free meals and other gratuities.

14.     Shiel management knows which employees are particularly efficient at preparing

this fraudulent documentation, and assigns those employees to handle especially voluminous

code sheets or uncooperative doctors' offices.

15.     Similarly with management knowledge and approval, Shiel sales personnel also

have engaged in a kickback scheme, whereby Shiel provides doctors with items and services of

4

value in order to induce or reward their referrals. Among other things, sales executives and sales reps have given doctors expensive and highly-sought-after sports tickets, high-value luxury gift cards, and expensive meals and entertainment. These employees fake receipts to get reimbursement for these expenses.

16.     Shiel also pays kickbacks to referring doctors in the form of free services, particularly by assigning phlebotomists who are on the Shiel payroll full-time to doctors' offices, where they perform general office services well beyond the permissible collection of specimens.

17.     Defendants' fraud has generated tens of thousands of fraudulent and false claims submitted to Government healthcare programs, which has cost the Federal and State Governments well over one hundred million taxpayer dollars.

## III.     JURISDICTION, VENUE, AND SPECIAL REQUIREMENTS

18.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular, the False Claims Act, 31 U.S.C. § 3729, *et seq*.

19.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the New Jersey, New York and Connecticut False Claims Acts on the ground that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20.     In addition, the FCA specifically confers jurisdiction upon United States District Courts under 31 U.S.C. § 3732. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants maintain offices and conduct business in the District of New Jersey.

21.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant Shiel maintains its primary offices and laboratory in New Jersey and otherwise does business in New Jersey, and because certain acts complained of herein occurred in the District of New Jersey.

22.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

23.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days, and shall not be served on the Defendants until the Court so orders.

24.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in Relator's possession contemporaneous with the filing of the Complaint. Relator complies with this provision by serving copies of this Complaint, and a written disclosure accompanied by material evidence, upon the Honorable Paul Fishman, United States Attorney for the District of New Jersey, and upon the Honorable Loretta E. Lynch, Attorney General of the United States. Relator similarly complies with the corresponding State False Claims Acts by serving Attorneys General Christopher S. Porrino of New Jersey, Eric T. Schneiderman of New York, and George Jepsen of Connecticut with the Complaint and disclosure.

25.     Relator is not aware that the allegations in this Complaint have been publicly disclosed. Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" since Relator has voluntarily provided information in Relator's possession to the Government before filing this Complaint, and has

6

knowledge which is both direct and independent of, and materially adds to, any public disclosures to the extent they may exist.

## IV.   THE PARTIES

26.   Plaintiff/Relator John Doe was employed by Defendants for several years.

27.   Defendant Shiel Medical Laboratory, Inc. is a for-profit New York Corporation with its principal offices and primary laboratory facility located at 8 King Road, Rockleigh, New Jersey, 07647.

28.   Defendant Shiel Holdings, LLC is a for-profit Delaware Limited-Liability Corporation, doing business as Shiel Medical Laboratory. Its principal place of business is 8 King Road, Rockleigh, New Jersey, 07647.

29.   Since in or about November 2013, Shiel has been a wholly-owned subsidiary of Spectra Laboratories, Inc.

30.   Spectra Laboratories, Inc. is a for-profit Nevada Corporation, with a principal place of business located at 920 Winter Street, Waltham, Massachusetts, 02451. Since in or about 1997, Spectra has been a wholly-owned subsidiary of Fresenius Medical Care.

31.   Fresenius Medical Care Holdings, Inc., doing business as Fresenius Medical Care North America, is a subsidiary of Fresenius Medical Care North America Limited Partnership, a Delaware Limited Partnership with a principal place of business located at 920 Winter Street, Waltham, Massachusetts.

32.   Defendant Fresenius SE & Co. KGaA is a German corporation with its principal offices located at Else-Kroner Strasse 1, 61352 Bad Homburg vor der Hohe, Germany.

33.   Fresenius Medical Care is a subsidiary of Defendant Fresenius SE & Co. KGaA.

## V.    GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A.    The Federal False Claims Act

34.    Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States. Further clarifying amendments were adopted in May 2009 and March 2010.

35.    The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). Any person found to have violated these provisions or conspired to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

36.    Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1).

37.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money

8

or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

38.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

39.     In this action, and under well-established precedent, the false or fraudulent nature of Defendant's conduct is informed or measured by its violation of, or failure to comply with, certain statutes and regulations material to governing: requirements that manufacturers must meet in order for medical procedures conducted using their equipment to qualify for reimbursement under government-funded assistance programs such as Medicare and Medicaid; and requirements that manufacturers must meet in order for medical procedures conducted using their equipment to qualify for payment under government-funded healthcare programs such as FEHBP and TRICARE.

**B.      State False Claims Acts**

40.     New Jersey, New York and Connecticut have enacted False Claims Acts which closely parallel the Federal False Claims Act in both text and substance.

41.     Because the States pay for approximately half of their respective Medicaid expenditures, Medicaid fraud is actionable under State False Claims Acts.

9

### C.   Federal Government-Funded Health Assistance Programs

#### 1.   Medicare

42.    Medicare is a federal government-funded medical assistance program, primarily benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").

#### 2.   Medicaid

43.    The Medicaid program was created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the medically needy aged, the blind, the disabled, and needy families with dependent children.  42 U.S.C. §§ 1396-1396v.  The Medicaid program is funded by both federal and state monies, (collectively referred to as "Medicaid Funds"), with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b; 1396d(b).  At the federal level, Medicaid is administered by CMS.  Medicaid is used by 49 states, each of which has a state Medicaid agency to administer the program.

44.    Each state is permitted, within certain parameters, to design its own medical assistance plan, subject to approval by the HHS.  Among other forms of medical assistance, the states are permitted to provide medical assistance from the Medicaid Funds to eligible persons for diagnostic procedures.  42 U.S.C. § 1396a(10)(A); 1396d(a)(12).

### 3.   General Provisions Applicable to Both Medicare and Medicaid

#### a.   Prohibitions Against Claims for Reimbursement for Services that were Not Provided as Claimed, were Not Medically Necessary, or are Otherwise False or Fraudulent

45.     Federal law prohibits a person from knowingly presenting or causing to be presented to Medicare or Medicaid a claim for a medical or other item or service that the person knows or should know was "not provided as claimed," a claim for such items or services that the person knows or should know is "false or fraudulent," or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E).

46.     Federal law similarly penalizes a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program." *Id.* § 1320a-7a(a)(8).

47.     Violation of this section is subject to a civil monetary penalty of $11,000[1] for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs. *Id.* § 1320a-7a(a).

## VI.    SPECIFIC ALLEGATIONS

### A. *Medicare Billing for Diagnostic Laboratory Procedures*

48.     As a provider of diagnostic laboratory procedures or tests that bills Medicare, Medicaid, and other government health programs, Shiel is required to comply fully with all applicable laws and regulations.

49.     Except under very limited and well-defined circumstances, the law forbids Shiel sales reps from giving gifts, or things or services of value, to referring doctors and other health care providers. Doctors are supposed to choose diagnostic labs based on merit alone, considering such things as quality of work and turnaround time for test results.

---

[1] By regulation, the maximum per-claim penalty was recently increased to $21,563. 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016) (effective Aug. 1, 2016).

50.    When ordering a diagnostic test for a Medicare-covered patient,[2] the doctor is supposed to indicate his or her diagnosis (or suspected diagnosis) by providing on the order form (or electronically) the corresponding diagnosis code (or codes) from the International Classification of Diseases and Related Health Problems ("ICD"), the current version of which is ICD-10.

51.    As Shiel states in its Medicare billing guidance for providers, CMS "has implemented uniform National Coverage and Administrative Policies for clinical laboratory services to ensure the medical necessity of certain services rendered to Medicare beneficiaries." Therefore, the Medicare carrier (*i.e.*, the fiscal intermediary) "requires medical necessity documentation to determine coverage." (www.shiel.com/for_physicians/billing_information) ("Shiel Website") (last visited Nov. 22, 2016); *accord* 42 C.F.R. § 410.32(d)(2).

52.    At least on its website, Shiel correctly instructs providers how appropriately to provide documentation of medical necessity by selecting a diagnosis code:

> Whenever you order a test that is subject to NCD or LCD, an ICD-[10] code is required on the test request form. The ICD-[10] code should indicate the medical necessity that you, in your judgment, believe is appropriate for the test. Please provide the ICD-[10] code(s) which most accurately describe the patient's condition. ***Do not choose a code merely to secure claim payment.*** . . . The ICD-[10] code that you provide must appear in the patient's medical record in order to support the medical necessity of the testing in the event of a post-payment review.

Shiel Website, *supra* (emphasis added).

53.    These legal requirements exist because, apart from certain specific exceptions, Medicare generally does not reimburse "screening" tests, *i.e.*, a diagnostic test that is given without the doctor suspecting that the patient has a particular disease or condition.

---

[2] Most of the patients and claims giving rise to this lawsuit were Medicare beneficiaries. However, where this Complaint by way of illustration describes a patient as a Medicare beneficiary or a claim for reimbursement as a Medicare claim, this is not intended to limit Relator's allegations to false claims to the Medicare program.

12

54.     Medicare best practices also call for the doctor to also have each patient who is prescribed a diagnostic test read and sign an Advance Beneficiary Notice ("ABN"). This is a document whereby the patient acknowledges that Medicare may find the test medically unnecessary and refuse to reimburse, and the patient agrees in those circumstances to pay "out of pocket."

55.     As Shiel acknowledges in its billing guidance for providers, absent a signed ABN, a lab may not bill the patient for the non-covered tests:

> In the event that a test is determined by Shiel Medical Laboratory's Medicare carrier to be medically unnecessary, the laboratory may only bill the patient if an Advance Beneficiary Notice (ABN) has been completed and signed by the patient before the specimen is collected.

Shiel Website, *supra*.

56.     Thus, in the normal course of business at a compliant lab, if the prescribing doctor chooses a non-covered diagnosis code, and the patient has not signed an ABN, the lab will not get paid for the diagnostic test, and it must "eat" the cost (*i.e.*, suffer a loss of revenue).

## B. *Shiel's Fraudulent Coding and Billing Practices*

57.     From at least in or about 2007 through the date that this Complaint was filed, Shiel regularly submitted false and fraudulent claims for reimbursement of diagnostic laboratory procedures, primarily blood tests and pathology.

58.     Specifically, when a physician ordering a diagnostic test provided a diagnosis code (ICD-9 or ICD-10) that Medicare, Medicaid, or another health-insurance program did not accept to justify reimbursing the test that was ordered, Shiel's claim for reimbursement would be rejected.

59.     When that happened, the billing department generated a "Missing Diagnosis Code" report for each rejected claim, indicating both the "submitted diagnosis" (*i.e.*, the diagnosis code that the physician specified) and the type of test that had been performed.

13

60.     The billing department also generated these reports when doctors failed to provide any diagnosis code when ordering a test.

61.     In the right column of the report was a blank box labeled "DX" (medical shorthand for "diagnosis." At the bottom of the report was a signature line labeled "Doctor's Signature."

62.     The billing department sent these reports, which were internally known as "code sheets" or simply "codes," to the sales reps who handled the respective doctors.

63.     Ostensibly, the reps were supposed to take the reports back to the doctor's office and ask the doctor to determine whether another (covered) diagnosis code would be appropriate given the patient's condition, or, where the doctor had provided no diagnosis codes, to provide a covered code. If so, the doctor was supposed to indicate that code in the "DX" box and sign the report.

64.     Shiel could then submit or re-submit the claim for reimbursement, and presumably it would get paid.

65.     However, as a matter of course, Shiel did not follow these simple steps. Instead, Shiel resorted to shortcuts that constituted fraud, and, in the case of claims submitted to Government healthcare programs, violations of the False Claims Act.

66.     Shiel management pressured the sales reps to "get the codes done" – in other words, to get the reports filled out and approved by any means necessary.

67.     This translated to sales reps and other employees impermissibly filling out the covered diagnosis codes themselves, and using deceptive and fraudulent means to get the reports "signed" by the doctors.

68.     Among other things, sales reps and other employees took the filled-out reports to doctors' offices and cajoled staff members to allow them to use the doctors' signature stamps to

14

"approve" them. Sales reps also would have the doctors' staff fax the "completed" reports back to Shiel, or ask the staff to "borrow" the fax machine, ostensibly for a personal matter, and fax them to Shiel themselves. Thus, when the reports were received at Shiel they falsely appeared to have been prepared and approved by a doctor, and sent by the doctor's office staff.

69.    Sometimes sales reps bribed or rewarded compliant staff members with gifts such as free meals.

70.    In the most extreme instances, sales reps and other employees would "cut and paste" a copy of the doctor's signature onto the report, or simply forge it.

71.    Shiel management well knew that the sales reps and other employees were engaged in this illegal conduct. For example, those few sales reps who refused to engage in misconduct to "get the sheets done" suffered large revenue decreases from their accounts, which management saw on periodic financial reports.

72.    Shiel managers also knew that certain employees "specialized" in "getting the codes done" in the fraudulent and illegal fashion described herein.

73.    For example, Shiel referring doctor David Klug routinely omitted diagnosis codes from his test orders. Regional Sales Manager Steve Morea assigned Client Service Rep Olga Jedinak to "get the codes done" since a large volume of tests ordered by Dr. Klug had not been reimbursed.

74.    However, when Olga attempted to meet with Dr. Klug to go over the reports (which numbered approximately 200), he phoned Morea and angrily complained that he had no time to go over so many reports.

75.    Morea knew that Olga would not engage in the fraud necessary to "get the codes done." Accordingly, Morea assigned the task to account executive named Erica Ryan.

15

76.     Ryan was considered the "go-to" person within Shiel to complete huge volumes of "codes" in a short time, because she had practically memorized the covered diagnostic codes and could quickly review the reports and input covered codes. More importantly, management knew that she was willing and able to commit fraud to get the job done.

77.     Upon information and belief, Ryan engaged in many of the fraudulent acts described herein, as there was no other way she could get such huge volumes of reports "done" within the deadlines set by management.

78.     Similarly, Senior Vice President of Sales Sal Prifitera had two service reps, Robin Cochrane and Doreen Mirlas, as direct reports. Under Shiel's usual corporate structure, service reps would be four management levels below Prifitera. However, upon information and belief, Prifitera assumed direct supervision over Cochrane and Mirlas to enable him to direct them in "getting codes done" and other illicit activities.

79.     District Manager James Gordon is, upon information and belief, one of Shiel's longest-serving sales reps. His predominant customer base is nursing homes, and he has sold to and serviced up to 100 nursing homes in the New York metropolitan area at a time.

80.     In part because diagnostic tests in nursing homes are frequently ordered by nursing staff (supervised by a doctor) rather than directly by a patient's treating physician, the nursing homes generate huge volumes of code sheets, which management required Gordon to complete and submit.

81.     Gordon has complained about the immense financial and psychological pressure that his supervisors have applied, including constant phone calls and threats of demotion and pay cuts, to compel him to "get the codes done." However, in recent months, he has grown increasingly

16

concerned about the propriety of Shiel's practices concerning the code sheets, and has resisted filling out and otherwise fabricating diagnosis codes.

82.     The sheer volume of the "code sheets" – in some cases, hundreds [or even thousands] of pages' worth of "missing" codes – coupled with managers' constant demands that the reps get the reports "done" within extremely short timeframes (*e.g.*, by the end of the week, ASAP, within a day), made it physically impossible for sales reps to get proper authorization for each completed report.

83.     In other words, when a manager ordered a sales rep to get a large stack of "codes" "done" in a short time, that manager knew (or at a minimum, should have known) that it would be impossible for the sales rep (or his client service reps) to take each report to a doctor, ask the doctor for a different code (and moreover a "covered" one that would enable insurance reimbursement), get the doctor to sign, and deliver the report back to billing.

84.     Even more tellingly, when employees *did* comply with those orders, Shiel managers knew (or at a minimum, should have known) that it *was* impossible for such a large volume of reports to have been completed (and similarly improbably, with most if not all of the "new" diagnostic codes ones being "covered" ones) and doctor-approved by the given deadline.

85.     Notwithstanding their website guidance for providers, Shiel also never required doctors to obtain signed ABNs from patients, even though there were huge numbers of tests that Medicare was not reimbursing.

86.     The fact that Shiel did not require signed ABNs further demonstrates the existence of the fraudulent coding scheme, because without a signed ABN, Shiel would have no way to get paid for a non-covered diagnostic test.  Because management relied on the sales reps and other

17

employees to unlawfully "get the codes done," Shiel did not need to bill patients for non-covered tests.

87.     Upon information and belief, based possibly on Relator's whistleblowing, in or about October 2016, Shiel management ordered the billing department to stop printing and distributing the code sheets.

88.     However, on or about November 16, 2016, Sal Prifitera hosted a meeting of the entire sales force. At that meeting, large stacks of code sheets, apparently recently printed, were present. The sales reps were eager to obtain these stacks, because they knew it would mean money in their pockets if they were completed and submitted. However, Prifitera refused to hand them out, because he explained (in substance and in part) that it would not be compliant, and they needed to get the code sheets out of the reps' hands.

89.     It soon became apparent to Relator that these code sheets were printed at the direction of managers who were directly involved in committing the fraudulent scheme.

### *Sales Reps' Incentive Compensation Propels the Coding Fraud*

90.     Shiel management used the sales reps' incentive compensation structure as both a carrot and a stick in Defendants' fraudulent billing scheme.

91.     Shiel sales reps were (and are) compensated in part on a commission basis. Usually, sales reps would be rewarded with up to ten percent of revenues collected as a commission or bonus. The client service reps, who handled routine matters for existing customers, were paid 0.5 to 2 percent of revenues. If sales reps failed to meet their quotas and targets, management would reprimand them and/or write them up with threats of termination.

92.    Because the "missing diagnosis code" reports documented diagnostic tests which Shiel had performed, but for which it had not been reimbursed by insurance, those "codes" not only represented potential revenue for Shiel, but also cash for the sales and service reps' pockets.

93.    To pressure sales reps to "get the codes done," managers constantly reminded them how much money the uncompleted reports represented to the reps in lost commission.

94.    As one manager texted a sales rep: "Please get ur [*sic*] codes in this week.  U [*sic*] have $6k outstanding.  $ that could b [*sic*] in ur [*sic*] pocket   That's a big % of ur [*sic*] total cash"

95.    Another manager texted a photo of an inches-high stack of reports to a sales rep, along with the following message: "These are my codes.  Never had this many before.  Please keep a log or make copies on what you [h]and in.  Educate your clients.  There are thousands and thousands of dollars there"

96.    A regional sales manager texted a photo of his hand next to a thick stack of reports to colleagues, complaining that it was "over four fingers high!!!"  Erica Ryan texted back, "And I have the other ½ [*sic*] of them!"

### *Kickbacks*

97.    Upon information and belief, Shiel regularly, and illegally, provided referring physicians and their medical practices free goods and services.

98.    Among other things, Shiel gave doctors valuable electronic equipment such as desktop and laptop computers, iPads, software, and wireless service.  These computers and devices were not dedicated for specific medical use related to the diagnostic-testing services Shiel provided to patients, therefore they did not fall within any regulatory safe harbor.

99.    For example, Sal Prifitera provided one medical practice with all-new Apple computers and MacPractice medical-office software, all of which was worth in excess of ten

19

thousand dollars. Again, this equipment was not limited in use to medical diagnostics, but was intended to be used (and was used) as the doctor's office computer equipment. (Notably, Prifitera also runs Shiel's client IT operation, creating a serious conflict of interest with his sales responsibilities).

100.    Shiel also provided phlebotomists free of charge to several referring doctors' offices, whose ostensible sole purpose was to collect blood samples which would be tested by Shiel. However, those phlebotomists regularly engaged in other, unrelated office duties, such as answering phones, taking patients' blood pressure, filing, and filling in for regular staff during breaks or absences. The provision of those additional duties fell outside the regulatory "safe harbor" established by HHS/OIG for phlebotomists.

101.    Some phlebotomists were also trained and directed to fill in and submit coding sheets as part of the previously-described illegal scheme.

102.    Many Shiel sales reps pay for gift cards and expensive dinners for their clients and prospects, for which they claim reimbursement by disguising these expenditures as legitimate expenses such as catered lunches for office staff in-service meetings.

103.    For example, Steve Morea personally purchases gift cards (usually in $100 denominations) which he distributes at holiday time to his customers. He submits this expense for company reimbursement by creating or generating false receipts for non-round numbers.

104.    Until in or about 2015, Shiel regularly provided referring doctors with valuable tickets to New York area sporting events, including Giants football, Mets baseball, and Nets basketball. As with the dinners, these purchases were usually disguised by the company, which had sales reps purchase the tickets individually and then reimbursed them as other, permitted expenses.

105.    Although Shiel has "officially" restricted reps from providing items of value to their customers, management not only ignores that continued practice, it actively (but quietly) condones it. For example, as of the 2015 holiday season, Shiel prohibited sales reps from sending gift baskets to customers. However, for the 2016 holiday season, sales managers including Cathy Winburn verbally instructed sales reps to purchase holiday catered lunches and other items for their customers, and to submit their claims for reimbursement as legitimate expenses such as making a presentation on insurance risk to doctors' office staffs over lunch.

## SPECIFIC FALSE CLAIMS

106.    Since in or about November 2010 and the filing date of this Complaint, Defendants submitted, caused to be submitted, and/or conspired with each other and with others to submit to Medicaid and/or Medicare, at least tens of thousands of false and fraudulent claims for reimbursement for diagnostic laboratory testing services.

107.    These claims were false and fraudulent due to the illegal coding/billing and kickback schemes previously described in this Complaint.

108.    Upon information and belief, many if not most of Shiel's claims for reimbursement for diagnostic laboratory tests prescribed and/or ordered by the following physicians/providers were false and fraudulent, for the reasons stated herein and below:

        a.  Eric Avezzano, M.D. (Bergen Gastroenterology, Emerson, NJ and other locations)

            i.  "Embedded" Shiel phlebotomist handled unrelated office tasks and filled out code sheets

            ii. Longtime client of Regional Sales Director Steve Morea, who provided him with expensive gifts

        b.  Clarkstown Urology (Clarkstown, NY)

21

    i.  Significant volumes of code sheets

    ii.  Longtime client of Vice President Sal Prifitera

c.  Village Medical (Pawling, NY)

    i.  Significant volumes of code sheets

    ii.  Client of Regional Sales Director Cathy Winburn

d.  David S. Klug, M.D. (Manhattan and Brooklyn, NY)

    i.  Significant volumes of code sheets

    ii.  Steve Morea ordered Erica Ryan to get codes done at his office (see *infra*)

e.  Gino & Joseph Bottino, M.D. (Mt. Kisco, NY)

    i.  Significant volumes of code sheets

    ii.  Steve Morea clients

f.  Arnold L. Weg, M.D. (Forest Hills, NY)

    i.  Significant volumes of code sheets

    ii.  Steve Morea client

g.  Complete Womens Health (Garden City, NY)

    i.  Significant volumes of code sheets

h.  Ventnor OBGYN (Ventnor, NJ)

    i.  Significant volumes of code sheets

i.  Ventnor Family Medical (Ventnor, NJ)

    i.  Significant volumes of code sheets

j.  Ephram Ovitsh, M.D. (Manhattan, NY)

    i.  Significant volumes of code sheets

k.  Ramapo Manor Center for Rehabilitation and Nursing (Suffern, NY)

        i.   Significant volumes of code sheets

        ii.  Client of District Manager James Gordon, Shiel's longest-serving sales rep

   l.  Pine Valley Center for Rehabilitation and Nursing (Spring Valley, NY)

        i.   Significant volumes of code sheets

        ii.  Client of James Gordon

   m.  St. Cabrini Nursing Home (Dobbs Ferry, NY)

        i.   Significant volumes of code sheets

        ii.  Client of James Gordon

   n.  Cliffside Nursing Home (Flushing, NY)

        i.   Significant volumes of code sheets

        ii.  Client of James Gordon

109.   Documentation of additional specific false claims is included with the Relator's Disclosure and is expressly incorporated herein by reference.

## VII.   THE GOVERNMENT HAS BEEN DAMAGED AS A RESULT OF DEFENDANTS' CONDUCT

110.   As a direct and intended result of their fraud, Defendants have submitted, and/or caused to be submitted, many thousands of false claims for diagnostic test reimbursement to Medicaid and Medicare, including the time period covered by this Complaint and within the applicable statutes of limitations.

111.   As alleged previously herein, Defendants routinely submitted and/or caused to be submitted to the Government claims for reimbursement, and/or re-submitted previously-rejected claims for reimbursement, based on false and fraudulent documentation.

112.   Relator conservatively estimates that Defendants received approximately $1-2 million *per month* as the intended result of these false and fraudulent claims.

113.    Based on these numbers, Relator estimates that Defendants' unlawful scheme has caused the federal and state governments to be defrauded of well over one hundred million taxpayer dollars.

## VIII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

114.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

115.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False
Record or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(1)(B))

116.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 102 of this Complaint as if fully set forth herein.

117.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

## THIRD CAUSE OF ACTION

(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(1)(C))

118.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 104 of this Complaint as if full set forth herein. As more particularly set

forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants conspired to

make or present false or fraudulent claims and performed one or more acts to effect payment of

false or fraudulent claims.

## FOURTH CAUSE OF ACTION

(New Jersey False Claims Act)
(N.J. Stat. §§ 2A:32C-1 through 2A:32C-17)

119.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 105 of this Complaint as if fully set forth herein.

120.    By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims to the New Jersey State Government for payment or

approval.

121.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted material facts, to induce the

New Jersey State Government to approve and pay such false and fraudulent claims.

122.    The New Jersey State Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or

conduct of Defendants as alleged herein.

25

123. By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

124. Pursuant to N.J. Stat. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## FIFTH CAUSE OF ACTION

(New York False Claims Act)
(N.Y. State Fin. Law §§ 187 *et seq.*)

125. Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

126. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

127. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

128. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

129. By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

130.    Pursuant to N.Y. State Fin. Law § 189.1(g), the State of New York is entitled to

three times the amount of actual damages plus the maximum penalty of $12,000 for each and

every false or fraudulent claim, record or statement made, used, presented or caused to be made,

used or presented by Defendants.

## SIXTH CAUSE OF ACTION

(Connecticut False Claims Act)
(Conn. Stat. Gen. Stat. §§ 4-274 through 4-289)

131.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 117 of this Complaint as if fully set forth herein.

132.    By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims to the Connecticut State Government for payment or

approval.

133.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted material facts, to induce the

Connecticut State Government to approve and pay such false and fraudulent claims.

134.    The Connecticut State Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or

conduct of Defendants as alleged herein.

135.    By reason of the Defendants' acts, the State of Connecticut has been damaged,

and continues to be damaged, in substantial amount to be determined at trial.

136.    Pursuant to Conn. Gen. Stat. § 4-275(b), the State of New Connecticut is entitled

to three times the amount of actual damages plus the maximum penalty of $11,000 for each and

every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## IX.    DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States and the States of New Jersey, New York and Connecticut, demands judgment against the Defendants, ordering that:

### As to the Federal Claims:

a. Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions which Relator currently estimates to be in the hundreds of millions of dollars, plus a civil penalty of not less than $6,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*.;

b. Relator be awarded the maximum relator's share authorized by 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

### As to the State Claims:

e. Relator and the States of New Jersey, New York and Connecticut be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by the States as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within the States, as provided by N.J. Stat. § 2A:32C-3, N.Y. Fin. Law § 189.1(g), and Conn. Gen. Stat. § 4-275(b);

28

f. Relator be awarded the maximum relator's share authorized by N.J. Stat. § 2A:32C-

7(a), N.Y. State Fin. Law § 190.6, and Conn. Gen. Stat. § 4-279(b);

g. Relator be awarded all costs and expenses associated with the pendent State claims,

plus attorney's fees as provided pursuant to N.J. Stat. § 2A:32C-8, N.Y. State Fin. Law § 190.7,

and Conn. Gen. Stat. § 4-279(b);

h. Relator and the States of New Jersey, New York and Connecticut be awarded such

other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

**FLEMING RUVOLDT PLLC**

By: _____

Eric H. Jaso (EJ9959)
250 Moonachie Road, Suite 501
Moonachie, NJ 07074
Tel. (201) 518-7878
Fax (201) 518-7879
ejaso@flemingruvoldt.com

*Attorneys for Relator*

Dated: November 23, 2016

29