UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES, STATE OF NEW JERSEY,
STATE OF NEW YORK, AND STATE OF
CONNECTICUT,
*ex rel.* MICHAEL WALDMAN,

                         Plaintiff/Relator,

       -against-

SPECTRA HOLDCO, LLC F/K/A SHIEL
HOLDINGS LLC AND SPECTRA
LABORATORIES, INC.,

                        Defendants.

**MEMORANDUM & ORDER
17-CV-2732 (NGG) (JRC)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff and Relator Michael Waldman ("Plaintiff") brings this action against his former employers, Defendants Spectra Holdco, LLC, formerly known as Shiel Holdings LLC, ("Shiel"), and Spectra Laboratories, Inc. ("Spectra"), (collectively "Defendants"), alleging violations of the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). (*See generally* Third Amended Complaint ("TAC") (Dkt. 38) ¶¶ 150-52.) Defendants have moved to dismiss the Third Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (*See* Not. of Mot. to Dismiss (Dkt. 43); Mem. in Supp. of Mot. to Dismiss ("Mot.") (Dkt. 43-1).) Defendants also move to strike certain allegations made in the Third Amended Complaint as immaterial or prejudicial. (*See* Mot. at 16.)

For the reasons set forth below, Defendants' motion to dismiss is DENIED. Defendants' motion to strike is GRANTED in part and DENIED in part.

## I.   BACKGROUND[1]

### A.   Billing Scheme for Diagnostic Medical Tests

According to the Third Amended Complaint, Defendant Shiel was a diagnostic medical laboratory business based in Rockleigh, New Jersey that served the greater New York metropolitan area. (TAC ¶ 5.) As a provider, Shiel was subject to Medicare and Medicaid regulations, which required, among other things, submitting documentation of "medical necessity" for diagnostic medical tests with certain diagnosis codes provided by doctors in order to determine coverage and issue reimbursement to the lab for the test. (*Id.* ¶¶ 6, 44-45, 47.) Not all diagnostic tests, however, are reimbursable; some tests are considered "non-covered" for certain diagnosis codes meaning any claim for reimbursement relating to those tests will be rejected. (*Id.* ¶ 6.) Accordingly, when ordering a diagnostic test for a Medicare-covered patient, the doctor is supposed to "indicate his or her diagnosis (or suspected diagnosis) by providing on the order form (or electronically) the corresponding diagnosis code (or codes) from the International Classification of Diseases and Related Health Problems ("ICD")." (*Id.* ¶ 46.) As stated on Shiel's website, providers are to choose a code that indicates the medical necessity the doctor believes is appropriate for the test and not to "choose a code merely to secure claim payment." (*Id.* ¶ 48.) In the event that Shiel's Medicare carrier finds a test to be medically unnecessary, a patient may be required to pay the bill only if an Advance Beneficiary Notice ("ABN") is signed by the patient acknowledging that the patient agrees to pay out of pocket when Medicare refuses to reimburse. (*Id.* ¶¶ 50-51.) "Thus, in the normal course of business at a compliant lab," if Medicare refuses to reimburse

---

[1] The following facts are taken from the Third Amended Complaint and, for the purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

a test and the patient has not signed an ABN, the lab will not receive payment for the diagnostic test and have to "eat the cost." (*Id.* ¶ 52.)

## B. Defendants' Alleged Billing Scheme

Plaintiff Michael Waldman, who was previously employed by Defendants as a Senior Sales Representative from November 2012 until December 31, 2017, alleges that Defendants were far from compliant with Medicare and Medicaid regulations. Rather, "Shiel management willfully and intentionally disregarded [Medicare/Medicaid] statutes and regulations" by creating a fraudulent billing scheme aimed at maximizing company revenues and personal profit. (*Id.* ¶¶ 8, 26.) Specifically, Plaintiff alleges that Defendants regularly submitted false and fraudulent claims for reimbursement of diagnostic laboratory procedures. (*Id.* ¶ 53.) As part of this scheme, when a claim for reimbursement of diagnostic testing was rejected, Shiel's billing department would generate a "Missing Diagnosis Code" report, internally known as "code sheets," that would be sent to sales reps who were supposed to then take the reports back to the doctor's office to request a covered (and reimbursable) code and sign the report. (*Id.* ¶¶ 9, 54-59.) Shiel management pressured sales reps to "get the codes done" by any means necessary, including having sales reps and others impermissibly fill out the covered diagnosis codes themselves (*id.* ¶¶ 14, 62-63); going to the doctors' offices and convincing staff to let them use the doctors' signature stamps to approve the reports on their own and/or "borrowing" the fax machine to fax the reports back to the billing department as if the reports were completed by the doctor (*id.* ¶¶ 14, 64); and forging the doctor's signature (*id.* ¶¶ 14, 66).

Plaintiff alleges that Shiel offered physicians and their medical practices kickbacks in the form of free goods and services to induce referrals. (*Id.* ¶¶ 16, 94). These alleged kickbacks took the form of all new Apple computers and software that did not fall

within any regulatory safe harbor to be recognized as legitimate medical equipment (*id.* ¶¶ 95-96); gift cards and expensive lunches or dinners (*id.* ¶¶ 16, 99-100, 102); sports tickets (*id.* ¶¶ 16, 101); and free services such as sending phlebotomists (whose ostensible purpose was to collect blood samples) to doctors' offices to handle unrelated office tasks that fell outside of regulatory safe harbors established by the U.S. Department of Health and Human Services and the Office of the Inspector General for phlebotomists (*id.* ¶¶ 17, 97). Employees often "faked receipts" to get reimbursement for these expenses. (*Id.* ¶ 16.)

Plaintiff alleges that management pressured and incentivized the sales team to engage in this fraudulent conduct by rewarding "compliant" staff members with free meals and other gratuities. (*Id.* ¶¶ 14, 65). Shiel also provided incentive compensation for its sales reps, whereby sales reps and certain employees tasked with servicing customer relationships received a percentage of collected revenues from lab tests ordered by their customers. (*Id.* ¶ 13.) As part of their compensation, sales reps could be rewarded with up to ten percent of revenues collected as a commission or bonus. (*Id.* ¶ 88.) Client service reps, who handled matters for existing customers, could obtain up to two percent of revenues. (*Id.*) Shiel management used these incentives to pressure sales reps to "get the codes done" by "constantly remind[ing] them how much money the uncompleted reports represented to the reps in lost commission." (*Id.* ¶¶ 90-93.) If sales reps failed to meet their quotas and targets, management would reprimand them through verbal chastising and criticism, and/or use threats of demotion, pay cuts, or even termination. (*Id.* ¶¶ 12, 88.)[2]

---

[2] Plaintiff also asserts that the sheer volume of the code sheets (upwards of thousands of pages), coupled with (1) constant demands to get the reports done in short timeframes (*e.g.*, by end of the week or even within a day), and (2) busy doctors who complained that they had no time to go over so many reports, made it physically impossible for sales reps to get

### C.   Retaliation

1.   Plaintiff Alerts Management to Potential
Fraudulent Billing Scheme

Plaintiff alleges that Defendants retaliated against him for refus-
ing to engage in their fraudulent billing scheme. (*Id.* ¶¶ 103-149.)
Plaintiff contends that he was subject to the same pressures as
his colleagues to "fraudulently add codes to patient records and
claim documentation to increase corporate revenue." (*Id.* ¶ 103.)
Plaintiff, however, consistently refused to engage in the fraud.
(*Id.*) Instead, in or around early 2016, Plaintiff began complain-
ing to management about the billing scheme. (*Id.* ¶ 104.) For
example, during a one-on-one meeting with Jim Murphy, Shiel's
Vice President of Clinical Sales, Mr. Murphy raised concerns
about Plaintiff's sales performance for the first time. (*Id.*) In re-
sponse, Plaintiff pointed out that his refusal to engage in the
coding fraud was having a direct impact on his customer reve-
nues as well as his incentive compensation and argued that he
should not be penalized for refusing to participate in misconduct.
(*Id.*) During another meeting in or around August 15, 2016, Mr.
Murphy met with Plaintiff again to discuss his sales performance,
and Plaintiff complained about Shiel's lack of clarity concerning
sales goals and compensation; how the lab is unable to handle
volumes of new business due to inefficient systems; and reiter-
ated his discomfort with Shiel's fraudulent coding practices. (*Id.*
¶¶ 105-06.) Mr. Murphy agreed with Plaintiff's concerns and told
Plaintiff that a follow-up meeting with human resources and
compliance officials should be scheduled. (*Id.* ¶ 106.)

---

the proper authorization for each completed report. (*Id.* ¶¶ 70, 79.) As
such, Plaintiff asserts that Shiel management knew which employees were
"particularly efficient" at filling out the reports with covered codes and as-
signed those employees to handle "especially voluminous code sheets or
uncooperative doctors' offices." (*Id.* ¶¶ 15, 68-78.)

Plaintiff asserts that "[n]o such meeting took place" and instead in an email dated August 29, 2016, Mr. Murphy "falsely mischaracterized their August 15 conversation." (*Id.* ¶ 107.) In his email, Mr. Murphy claimed that he "expressly criticized" Plaintiff's sales performance noting that Plaintiff failed to grow his customer base and had not met the goals of Shiel's "new sales compensation program"[3] such that a formal written warning for Plaintiff's performance was placed in his personnel file. (*Id.*) Plaintiff alleges this was the first formal warning he has received since working at Shiel. (*Id.*)

On September 6, 2016, Plaintiff emailed Peter Connelly, a Compliance Officer for Fresenius Spectra Labs East before it was acquired by Shiel, writing that sales and service reps were being directed to fill out missing code sheets with the most "flexible codes" (or codes that would most likely be reimbursable). (*Id.* ¶¶ 109-10.) Plaintiff told Mr. Connelly that he refused to comply and that he directed his service reps not to fill in the missing codes either. (*Id.* ¶ 110.) Plaintiff stated that as a result of his refusal to engage in fraud, Shiel was not getting reimbursed, and Plaintiff was written up for not making his quotas. (*Id.* ¶ 111.) He further stated that submitting false documentation to the federal government was illegal and could put the company at risk. (*Id.* ¶ 112.) Plaintiff therefore asked Mr. Connelly to investigate. (*Id.*) On September 9, 2016, Mr. Connelly responded, assuring Plaintiff that "the company was 'taking it very seriously.'" (*Id.* ¶ 113.) Mr. Connelly referred the matter to in-house counsel, Sarah Schuler, who emailed Plaintiff informing him that the company retained outside counsel to assist and asking Plaintiff to schedule an interview. (*Id.*) During the interview on or about September 29, 2016, Ms. Schuler and outside counsel again reassured Plaintiff that they would investigate. (*Id.*)

---

[3] A new program that, by Plaintiff's account, provided significant financial incentives for the sales reps to engage in coding fraud. (*Id.*)

### 2. Retaliation Following Plaintiff's Whistleblowing

Soon after raising his concerns, however, Plaintiff began to experience an increasingly hostile work environment. Plaintiff alleges that, among other things, management began excluding him from lucrative clients and territories while other and more favored reps were chosen to service multiple territories and otherwise increase their potential earnings. (*Id.* ¶ 114.) For example, in early 2016, Plaintiff solicited and earned the business of the Jewish Home of Rockleigh, a nursing home that neighbored Shiel's headquarters. (*Id.* ¶ 116.) Despite Shiel's lab being incapable of handing the additional volume, Plaintiff and another sales rep stepped in to address the concerns, keeping Jewish Home as a customer and increasing its referral volumes. (*Id.*) In May 2016, Plaintiff was advised that he and his co-sales rep would get "50/50 credit" for the new business, and Plaintiff estimated that his compensation for Jewish Home would exceed $25,000.00 per year. (*Id.* ¶ 117.) In December 2016, however, Senior Vice President of Sales, Sal Prifitera, falsely accused Plaintiff of failing to provide appropriate service to Jewish Home and that the nursing home would be switching to a different lab. (*Id.* ¶¶ 74, 118.) Mr. Prifitera also claimed that he was actually responsible for obtaining the business resulting in Plaintiff receiving no credit or compensation for bringing in a new client. (*Id.* ¶ 118.) Plaintiff confirmed with the Director of Nursing at Jewish Home that the nursing home was *not* ending their relationship with Shiel and instead intending to continue increasing the amount of business for Shiel. (*Id.* ¶ 119.)

In another example, Plaintiff alleges that he established a relationship with Dr. Yaffe, a New York gastroenterologist who referred a large volume of business to Manhattan Labs—a major Shiel competitor. (*Id.* ¶ 123.) Plaintiff alleges he was close to closing a deal with Dr. Yaffe to switch to Shiel for his referrals when Mr. Prifitera interfered, telling Plaintiff to "hold off" because he was working on a direct relationship between Manhattan Labs

and Shiel but still promising that Plaintiff would get credit for the new business. (*Id.*) After the deal between Shiel and Manhattan Labs was consummated, Plaintiff never received credit, losing what he estimates to be $100,000.00 in annual compensation. (*Id.* ¶ 124.) Plaintiff alleges that when he complained about the deal, Mr. Prifitera told him he "never had a chance of closing a deal either with Dr. Yaffe or Manhattan Labs." (*Id.*)

Around November 2016, Plaintiff again complained to Mr. Murphy about the inconsistent quota requirements via email, including complaints from fellow colleagues, and further noted that he had been reassigned to sales territories that had fewer prospects and produced less revenue than the geography assigned to other sales reps. (*Id.* ¶ 125.) Rather than reply, Mr. Murphy forwarded the email to Mr. Prifitera who denied making any promises or moving goalposts with respect to Plaintiff's compensation. (*Id.* ¶ 126.) Mr. Prifitera blamed Plaintiff for "fostering discontent among Shiel employees" and included a written warning instructing Plaintiff to cc Mr. Prifitera on any further communication referencing comments made by management. (*Id.* ¶¶ 126-27.)

### 3. Government Investigation and Plaintiff's Termination

By December 2016, the Justice Department was investigating[4] the Defendants' billing practices and rumors circulated that this was the result of Plaintiff's complaining. (*Id.* ¶¶ 129-32.) Plaintiff reported the accusations that he was the whistleblower to in-house counsel and also reported the harassment and discriminatory treatment by Mr. Murphy and Mr. Prifitera, as well as information about human resources ignoring his complaints and

---

[4] The Justice Department's investigation was in addition to the Defendants' own internal investigation conducted by Fresenius's in-house counsel and retained outside counsel Hogan Lovells. (*Id.* ¶ 113.)

failing to take any actions in response. (*Id.* ¶ 133.) In early January 2017, Plaintiff also reported to management and legal that his self-evaluation form included metrics on collecting codes to which he argued should not be included due to the current investigation. (*Id.* ¶ 134.) In-house counsel reassured Plaintiff that reps were no longer responsible for obtaining missing codes and to write "not applicable" for that section. (*Id.*) Yet, at his annual performance review in March 2017, Plaintiff received all negative scores (a first for Plaintiff), including low scores for "collecting codes" and for "honesty and integrity." (*Id.* ¶¶ 135-37.)

In September 2017, Quest entered into an agreement with Fresenius to acquire Shiel and, as a result, Shiel management individually met with all of its employees regarding their employment. (*Id.* ¶¶ 142-44.) During Plaintiff's meeting, management informed him that he would be terminated by Shiel effective December 31, 2017, but that he had the opportunity to apply for employment with Quest. (*Id.* ¶ 144.)[5] Plaintiff soon learned that Quest had hired "nearly everyone" to continue their positions after December 31, 2017, including Mr. Prifitera, whom they hired as a senior sales executive. (*Id.* ¶ 146.) Plaintiff did not receive the same opportunity and therefore alleges he was "singled out not to be offered employment by Quest." (*Id.*) Following email exchanges where Mr. Murphy noted that Plaintiff would not be

---

[5] Plaintiff also alleges that Mr. Prifitera falsely reported that Plaintiff had confronted him after the meeting and physically threatened him. (*Id.* ¶ 145.) When confronted by human resources, Plaintiff denied and urged them to obtain the security camera video to confirm. (*Id.*) Plaintiff further alleges that even after his official termination from Shiel, Mr. Prifitera continued to harass him, including what he believes were false reports to Northvale, New Jersey police that Plaintiff verbally threatened a co-worker and posted threatening messages about said co-worker on an online message board. (*Id.* ¶¶ 148-49.) Plaintiff believes Mr. Prifitera made these accusations to police because Mr. Prifitera lives in Northvale, NJ. (*Id.* ¶ 149.)

receiving his commissions, Plaintiff reported this to human resources which led to his receiving his commissions. (*Id.* ¶ 147.) He then ended his employment with Shiel. (*Id.*)

## II.   PROCEDURAL HISTORY

On November 23, 2016, Plaintiff and Relator Michael Waldman brought this *qui tam* action, under a "John Doe" pseudonym, on behalf of the United States of America, the State of New Jersey, the State of New York, and the State of Connecticut against Defendants Shiel and Spectra Laboratories alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and analogous State statutes. (*See* TAC ¶¶ 1-2.) On June 14, 2022, the United States, New Jersey, New York, and Connecticut governments declined to intervene in the action and the case was unsealed. (*See* Dkts. 13-17.) Following amendments to the complaint and dismissal of certain claims barred by the first-to-file rule,[6] Plaintiff filed his Third Amended Complaint after being granted the court's leave to do so, using his real name, on May 22, 2023. (*See* TAC ¶ 1; *see also* Min. Entry dated April 19, 2023.) Defendants moved to dismiss Plaintiff's complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See generally* Mot.) Defendants have also moved to strike certain allegations contained in the Third Amended Complaint. (*See id.* at 16-18.) Plaintiff opposed the motion (*see* Opp. (Dkt. 43-2)), and Defendants filed a reply (*see* Reply (Dkt. 43-4)).

---

[6] A related FCA action was filed in this court on March 4, 2016, and prior to the instant action. *See United States ex rel. YNKDY-2 v. Shiel Medical Laboratory, et al.*, No. 16-CV-1090 (NGG) (TAM) (E.D.N.Y. 2016). Pursuant to FCA's first-to-file bar, when a person brings an a federal FCA *qui tam* action, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action. 31 U.S.C. § 3730(b)(5). Defendants argued that many of Plaintiff's claims are barred by *YNKDY-2* because both cases assert the "same material elements of fraud." (*See* PMC Letter (Dkt. 24) at 2 (quoting *U.S. ex rel. Wood v. Allergan*, 899 F.3d 163, 169 (2d Cir. 2018).)

The court now turns to the instant motion to dismiss.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Id.* In deciding a motion to dismiss, the court will accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). However, allegations that "are no more than conclusions [] are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). Dismissal for failure to state a claim is appropriate if it is clear from the face of the complaint that a claim is barred as a matter of law. *Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019).

## IV. DISCUSSION

### A. Retaliation Under the False Claims Act

Congress enacted the FCA, 31 U.S.C. § 3729 *et seq.*, in 1863 "with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000). The statute, among other things, subjects to liability

---

[7] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

"[a]ny person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[.]" 31 U.S.C. § 3729(a). The Government may bring an action under the FCA, *id.* § 3730(a), and, as relevant here, a private individual may pursue an action on a *qui tam* basis "in the name of the Government." *Id.* § 3730(b)(1); *see also Vermont Agency of Natural Res.*, 529 U.S. at 769.

The FCA also includes a "whistleblower" provision which provides that:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To plead a claim of retaliation under this provision, a plaintiff must show that "(1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *See United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017). Unlike other provisions of the FCA, a plaintiff "need not plead an FCA retaliation claim with particularity because no showing of fraud is required." *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 297 (E.D.N.Y. 2016).

### 1. Protected Conduct

In this district, protected conduct is "interpreted broadly and encompasses two kinds of conduct: (1) lawful acts done by the employee in furtherance of an action under the FCA, and (2)

other efforts to stop one or more violations of the FCA." *Id.* at 298. To prove that he engaged in conduct protected under the statute, plaintiff "need not prevail on his underlying FCA claims, but simply demonstrate that he had been investigating matters that were calculated, or reasonably could have led, to a viable FCA action." *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 256 (N.D.N.Y. 2013). It is also not necessary for the plaintiff to "know that the investigation he was pursuing could lead to a False Claims Act suit." *Swanson v. Battery Park City Auth.*, No. 15-CV-6938 (JPO), 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016). As to the second category of protected conduct, "a retaliation claim can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." *Id.*

Plaintiff points to several instances in which he allegedly complained to management about the Defendants' fraudulent billing practices and argues that this conduct constituted "protected activity" under the FCA. (*See, e.g.*, TAC ¶¶ 103-06, 109-13, 134.) Defendants assert that these instances cannot amount to protected activity because they are vague and generalized concerns motivated by Plaintiff's efforts to explain his performance issues and frustration for receiving negative feedback. (*See* Mot. at 7-10.)

While true that raising "generalized concerns" is not activity that the FCA protects, *see Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 101 (2d Cir. 2019) (Summary Order), Plaintiff's complaints about "coding fraud" made to the Vice President of Clinical Sales on two different occasions, coupled with his request to Fresenius's Compliance Officer to investigate the alleged fraud, support the inference that the Plaintiff was engaged in efforts to stop practices that "were illegal or may lead to the submission of false claims." *Id.* Indeed, Plaintiff alleges that in his email to the

Compliance Officer, Plaintiff noted that "submitting documentation the federal government with made-up codes that the prescriber did not supply would be illegal and could put the company at risk." (TAC ¶ 112.) Further, Plaintiff's conduct did not stop at merely informing management. Plaintiff also alleges that in refusing to comply with the fraudulent scheme, he "directed his service reps not to fill in missing codes either" thereby subjecting multiple Shiel employees to a potential loss in compensation. (*Id.* ¶ 110.) Thus, this court disagrees with Defendants' assertion that Plaintiff "offers no explanation for how his 'refusal' to complete code sheets reflected an effort to stop any FCA violation" when Plaintiff has repeatedly alleged that instructions to fill in reports with the most "flexible" codes is against Medicare's—and Shiel's—own regulations and guidance. (*See* Mot. at 9; TAC ¶¶ 44-52, 61, 110-11); *see also* C.F.R. § 410.32(d)(2). Accordingly, when taken together, Plaintiff sufficiently alleges that he engaged in one or more efforts to stop violations of the FCA.

Moreover, Defendants' argument that Plaintiff's allegations are merely "[u]ninformed speculation" made in response to negative feedback is without merit. (Mot. at 8.) Plaintiff alleges in detail a complex billing scheme that resulted in claims being submitted to government healthcare programs in "violation[] of the False Claims Act." (*See* TAC ¶¶ 53-102.) These allegations include mention of fraudulent conduct by colleagues who forged doctor signatures, as well as naming specific individuals who were known to "get the codes done" in an expedited and allegedly illegal manner. (*See id.*) Plaintiff has thus sufficiently alleged that his complaints were not merely because he was upset with feedback regarding low performance, but rather because he refused to engage in conduct he reasonably considered illegal in an effort to "expose or investigate Medicare/Medicaid fraud." *Cf. Johnson v. The Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 269 (W.D.N.Y. 2010) (finding plaintiffs failed to allege that their

complaints "were made in furtherance of this or any other *qui tam* action, or that they were part of an investigation by either plaintiff into Medicare/Medicaid fraud"). *See Bacewicz v. Molecular Neuroimaging, LLC*, No. 17-CV-85 (MPS), 2019 WL 4600227, at *6 (D. Conn. Sept. 23, 2019) ("The Second Circuit has also held that simply refusing to participate in a fraudulent scheme can constitute efforts to stop 1 or more violations of the FCA.").

> 2.   Defendants' Knowledge of Protected Conduct

A plaintiff must also allege that "his employer was aware that he was engaged in conduct that is protected by section 3730(h)." *Weslowski v. Zugibe*, 626 F. App'x 20, 21 (2d Cir. 2015) (Summary Order). "The requisite "standard for notice is flexible: the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." *Swanson*, 2016 WL 3198309, at *5.

The Defendants assert in a footnote that "there is no basis to infer that Plaintiff directed his complaints to the requisite high level personnel" such that the Defendants were made aware of the FCA-protected activity. (Mot. at 9 n.1.) To the contrary, Plaintiff's complaint includes allegations that he informed several high-level executives, including the Vice President of Clinical Sales, Fresenius's Compliance Officer, and the human resources head, Sheryl Morgan, as well as in-house counsel after the Defendants finally decided to investigate Plaintiff's claims. (*See* TAC ¶¶ 104, 109, 112-13, 133.) Defendants' attempt to downplay Shiel management as just "employees in sales" (Reply at 3), is belied by the allegations that Plaintiff complained to compliance and human resources. Moreover, Plaintiff informed the Compliance Officer that he refused to comply with fraudulent activity and also directed his team not to participate. (*Id.* ¶ 110.) Plaintiff has thus sufficiently presented evidence demonstrating that his complaints were directed at exposing a fraud upon the Government

such that Defendants were on notice that he was engaged in protected activity. *See United States v. New York Inst. of Tech.*, No. 18-CV-7884 (ALC), 2022 WL 976893, at *5 (S.D.N.Y. Mar. 31, 2022); *see also Dhaliwal*, 752 F. App'x at 101 (noting that the court has "little trouble" concluding defendant was on notice where plaintiff informed supervisor that she "wanted to bring her concerns to legal/compliance").

### 3.   Retaliatory Action

Finally, Plaintiff must allege that the defendant took "adverse action against him because he engaged in the protected activity." *Chorches*, 865 F.3d at 95. An adverse action is a materially adverse change in the terms and conditions of one's employment. *Mirza v. Garnet Health*, No. 20-CV-00556 (PMH), 2022 WL 826410, at *11 (S.D.N.Y. Mar. 17, 2022).[8] "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).

Here, Plaintiff identifies several events that he argues constitute materially adverse changes, including (1) a loss of promised compensation, (2) deprivation of lucrative opportunities, and (3) being passed over for the same job opportunity that most co-workers received. (*See* Opp. at 13.) Specifically, Plaintiff alleges that "[s]hortly after" he began making complaints to management regarding the improper billing practices, he was excluded from lucrative clients and territories and reassigned to sales territories with fewer prospects than those assigned to other sales

---

[8] "While the Second Circuit has not defined 'adverse action' in the context of an FCA retaliation claim, courts commonly apply the Title VII definition." *Id.*

reps. (TAC ¶¶ 114, 125.) He also claims that management "re-neged on written promises and representations" and applied "corporate rules concerning sales territory and customer assign-ments to [Plaintiff] that management did not apply to other sales reps" resulting in lower compensation. (*Id.* ¶¶ 115-28.) Further, Plaintiff alleges that as a result of his complaints, he received his first negative performance evaluation and in turn was not rehired by the successor company Quest when most of his other co-work-ers were. (*See id.* ¶¶ 135-39, 142-46.)

Defendants argue that Plaintiff fails to allege causation and thus cannot plead retaliation. (*See* Mot. at 11-16.) Defendants point to the fact that the alleged retaliation did not come until after management expressed concerns with Plaintiff's performance. (*Id.* at 14.) While this could prove a legitimate, non-retaliatory reason for Defendants' conduct, the court cannot determine at the current stage of the proceedings whether defendant "would have taken the same action even in the absence of the allegedly improper reason." *Kohutka v. Town of Hempstead*, No. 11-CV-1882 (ADS), 2012 WL 13109880, at *8 (E.D.N.Y. Mar. 20, 2012). And the court cannot ignore the larger context at play which, based on Plaintiff's allegations, suggests pretext. *Krause v. Eihab Hum. Servs., Inc.*, No. 10 CV 898 (RJD), 2015 WL 4645210, at *10 (E.D.N.Y. Aug. 4, 2015) ("Under the *McDonnell Douglas* framework, after the defendant has articulated a non-retaliatory reason for the employment action . . . plaintiff must then come forward with evidence that the proffered, nondiscriminatory rea-son is a mere pretext for actual discrimination.").[9] Here, Plaintiff alleges that the only reason Defendants raised concerns about his

---

[9] The Second Circuit's summary order in *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010), has been read as an "implicit endorsement of the *McDonnell Douglas* framework for FCA whistleblower claims." *New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 481 n.13 (S.D.N.Y. 2021); *see also Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765 (NRB), 2012 WL 1901199, at *10 (S.D.N.Y. May 21, 2012).

performance was because he had refused to engage in fraudulent coding which was having a "direct impact on his customer revenues as well as his incentive compensation." (TAC ¶ 104.) Construing the allegations in Plaintiff's favor, one could plausibly infer that the performance concerns, written warnings, and evaluation faulting Plaintiff for his codes and alleged dishonesty—amid an investigation into fraudulent codes—were mere pretext for the retaliation against him.

Defendants correctly argue, however, that Plaintiff's allegations about lost compensation that he ultimately received do not amount to adverse actions. (Mot. at 15 (citing TAC ¶ 147).) "Courts have consistently held that paycheck delays do not constitute an adverse employment action for purposes of making a prima facie employment discrimination or retaliation claim." *Lopez v. Guardian Serv. Indus. Inc.*, 08-CV-8569, 2012 WL 463958, at *4 n.4 (S.D.N.Y. Feb. 10, 2012). But Plaintiff's allegations regarding transfer to less lucrative accounts and exclusion from previous clients are sufficient to survive a motion to dismiss. *See Campbell v. Grayline Air Shuttle, Inc.*, 930 F. Supp. 794, 802 (E.D.N.Y. 1996) (noting that adverse actions can include changes that result in a deprivation of a position or an opportunity and may be evidenced by a decrease in wages or salary).

Finally, with respect to Plaintiff's allegation that he was passed over for the same job opportunity that his other co-workers received, Plaintiff's allegations are adequately pled for purposes of his FCA retaliation claim. Plaintiff invokes temporal proximity to establish causation, arguing that Defendants' failure to hire him at the successor company Quest is an adverse action that immediately followed his complaints. (*See* Opp. at 13 (citing *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)).) To argue temporal proximity sufficient to plead retaliation, "the proximity must be very close." *United States ex rel. O'Toole v.*

*Cmty. Living Corp.*, No. 17-CV-4007 (KPF), 2020 WL 2512099, at *12 (S.D.N.Y. May 14, 2020).

Plaintiff alleges that over the course of a two-year span he made specific efforts to stop violations of the FCA that were each met with adverse actions. (*See* Opp. at 12-14.) That said, there was a five- to six-month gap between his first negative performance evaluation (in March of 2017) and his realization that he had not been offered employment at Quest (around September 2017). While courts have found as little as three months to be too long between protected conduct and a defendant's retaliation, courts have also found that "gaps of seven and eight months may support a sufficient temporal connection if accompanied by other indicia of retaliatory motive." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 785 (S.D.N.Y. 2019); *see also Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (*comparing*, in the Title VII context, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir.1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity), *with Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir.1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection)).

Plaintiff first raised concerns about Defendants' potentially fraudulent conduct in early 2016 (TAC ¶¶ 104-05), and by mid-December, Plaintiff alleges that he was being deprived of lucrative clients. (*Id.* ¶¶ 118-124.) Following his annual performance review on March 29, 2017 (*id.* ¶ 135), and the announcement that Shiel was being sold to Quest on September 26, 2017 (*id.* ¶ 142), Plaintiff was then informed that he would be terminated effective December 31, 2017, with the opportunity to apply for employment at Quest. (*Id.* ¶¶ 142-44.) However, Plaintiff alleges that in the days following his termination, he spoke with "several

of his fellow sales reps and learned that Quest had hired nearly everyone to continue their positions," including Mr. Prifitera, the colleague Plaintiff alleges engaged in much of the retaliatory conduct. (*Id.* ¶¶ 114-28, 132, 145-46, 148-49.) Plaintiff states that he was thus "singled out not to be offered employment by Quest" and that this was in retaliation for his complaints regarding fraudulent billing. (*Id.* ¶¶ 20, 146.) These "surrounding circumstances" as alleged by Plaintiff support the inference that Plaintiff was not offered employment at Quest in retaliation for his protected activity. *Beckles-Canton v. Lutheran Soc. Servs. of New York, Inc.*, No. 20-CV-4379 (KPF), 2021 WL 3077460, at *9 (S.D.N.Y. July 20, 2021) (finding that plaintiff adequately pleaded that defendant's bases for her dismissal were pretextual in light of the surrounding circumstances).

Drawing all reasonable inferences in Plaintiff's favor, the court finds that he has adequately pled a retaliation claim. Defendants' motion to dismiss is therefore DENIED.

### B.   Rule 12(f) Motion to Strike

Defendants also ask this court to strike certain allegations made in the Third Amended Complaint relating to kickbacks and other litigation in which the Defendants were a party. (Mot. at 16-18.)

Under Federal Rule of Civil Procedure 12(f), "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a motion to strike, the movant must show (1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Jalayer v. Stigliano*, 420 F. Supp. 3d 58, 64 (E.D.N.Y. 2018). "Motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation."

*Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y. 2011).

Defendants first move to strike all allegations referencing purported kickbacks made by the Defendants to healthcare providers. (Mot. at 17 (citing TAC ¶¶ 1, 16-17, 94-102, 129).) Defendants argue that because Plaintiff has dismissed his *qui tam* FCA claims, none of the instant allegations relate to his retaliation claim and should therefore be dismissed. (*Id.*) As Plaintiff's allegations purport to show the magnitude of the alleged fraudulent scheme, the court cannot find, at this stage, that these allegations "have no possible relation or logical connection to the subject of the litigation." *Kidder v. Hanes*, No. 21-CV-1109S, 2023 WL 2992032, at *5 (W.D.N.Y. Apr. 18, 2023); *see G.L.M. Sec. & Sound, Inc. v. LoJack Corp.*, No. 10-CV-4701 (JS), 2012 WL 4512499, at *7 (E.D.N.Y. Sept. 28, 2012) ("This background information provides context for and is logically connected to both the state of mind and motivation of the parties."). Thus, Defendants' motion to strike allegations regarding kickbacks is DENIED.

Defendants also seek to strike paragraph 140 of the Third Amended Complaint which refers to a retaliation lawsuit filed by another former Shiel employee against the Defendants. (TAC ¶ 140.) In Plaintiff's complaint, he specifically names the former employee, noting that he was terminated "allegedly in retaliation for reporting numerous unlawful practices to management" and that the former employee filed a lawsuit in the District of New Jersey that has since settled. (*Id.*) Defendants are correct that in the Second Circuit, references to other litigations that were not resolved on the merits are immaterial. *See, e.g., Cowell v. Utopia Home Care, Inc.*, 144 F. Supp. 3d 398, 406 (E.D.N.Y. 2015); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-CV-4050 (PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010). Therefore, Defendants' motion to strike is GRANTED with respect to the allegation in paragraph 140.

## V.  CONCLUSION

For the foregoing reasons, the court DENIES Defendants' motion
to dismiss, DENIES Defendants' motion to strike allegations con-
cerning kickbacks, and GRANTS Defendants' motion to strike
paragraph 140 of the Third Amended Complaint. The parties are
DIRECTED to contact the chambers of Magistrate Judge James
R. Cho regarding next steps in the case.

SO ORDERED.

Dated:      Brooklyn, New York
            February 6, 2024

                                    s/NICHOLAS G. GARAUFIS
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge